IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILLIAM R. CANADA, JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| UNITED STATES OF AMERICA | § | No. 3:17-cv-2465-S-BN |
| (INTERNAL REVENUE SERVICE), | § | |
| MICHAEL HALPERT (in his individual | § | |
| capacity), ROBERT MEYER (in his | § | |
| individual capacity), and DENISE | § | |
| McCASKILL (in her individual capacity), | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE**
**UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the undersigned United States magistrate judge

for pretrial management under 28 U.S.C. § 636(b) and a standing order of reference

from United States District Judge Karen Gren Scholer. *See* Dkt. No. 27.

Plaintiff William R. Canada, Jr. has filed an Amended and Restated Complaint

under Federal Rules of Civil Procedure 15(a)(1). *See* Dkt. No. 14 (the "Amended

Complaint"). In view of that filing, the Court then denied the Motion to Dismiss

Plaintiff's Complaint with Prejudice [Dkt. No. 11] filed by Defendants Michael Halpert,

Denise McCaskill, Robert Meyer, and United States Internal Revenue Service without

prejudice as moot. *See* Dkt. No. 17.

Defendants have now filed their Second Motion to Dismiss Plaintiff's Complaint,

asserting that Canada's claims must be dismissed under Federal Rule of Civil

Procedure 12(b)(1) for lack of subject matter jurisdiction. *See* Dkt. No. 18 (the "Second MTD") at 1. Canada has responded in opposition, *see* Dkt. Nos. 19 & 20, and Defendants have replied in support of their Second MTD, *see* Dkt. No. 22. Then, without opposition, the Court granted Canada's request for oral argument and gave him leave to file Plaintiff's Sur-Reply Opposing Defendants' Second Motion to Dismiss Plaintiff's Complaint [Dkt. No. 30]. *See* Dkt. No. 29.

Defendants included in the title of their Second MTD "Alternative Motion for Summary Judgment." *See* Dkt. No. 18. But, as Canada's response points out, "Defendants present no summary judgment arguments in the motion, do not address the summary judgment standards of Rule 56 or the Local Rules of this Court for summary judgment motions, or present any summary judgment evidence in support of any summary judgment request." Dkt. No. 20 at 4 n.3. Canada explains that he therefore "believes that Defendants' motion contains a misnomer and will not respond to such motion as a traditional summary judgment motion by presenting evidence extrinsic to the pleading establishing genuine issues of material disputed fact requiring denial of a 'summary judgment' motion." *Id.*

The undersigned likewise concludes that Defendants have not in fact moved, even alternatively, for summary judgment under Rule 56, and the undersigned will analyze the Second MTD only under Rule 12(b).

The Court heard oral argument on the Second MTD on June 11, 2018. *See* Dkt. No. 33.

For the reasons and to the extent explained below, the Court should grant Defendants' Second Motion to Dismiss Plaintiff's Complaint [Dkt. No. 18].

## Applicable Background

In his Amended Complaint, Canada alleges that he commenced "this action against Defendants, United States of America, acting by and through its agency and instrumentality, the Internal Revenue Service of the Department of the Treasury (the 'IRS'), Michael Halpert, individually and not in his official capacity ('Halpert'), Robert Meyer, individually and not in his official capacity ('Meyer'), and Denise McCaskill, individually and not in her official capacity ('McCaskill') (Halpert, Meyer, and McCaskill are sometimes collectively referred to as the 'Individual Defendants"), seeking damages and the recovery of attorney's fees for claims arising out of the facts further described in this" Amended Complaint. Dkt. No. 14 at 1. He seeks an award of damages as well as punitive damages against the Individual Defendants and an award against the United States of his attorney's fees, costs, and expenses in his bankruptcy case and the contested matter objecting to the IRS penalty claim. *See id.* at 46.

Canada alleges that his

> lawsuit arises from the vindictive and gross abuse of the "absolute power" of "taxation" entrusted under the tax laws to the IRS, Halpert, Meyer, McCaskill, and other agents within the IRS whose identities are currently unknown to Plaintiff, a power that Chief Justice Marshall observed in his landmark decision almost 200 years ago is constrained only by the United States Constitution and the discretion of those wielding the taxing power. In 2015, Defendants wrongfully and maliciously wielded that power in an effort to punish and destroy Plaintiff financially merely because 13-15 years earlier he had worked for a now-defunct company that had marketed sophisticated tax plans and strategies to very wealthy clients, plans and strategies that the IRS later

deemed to be abusive tax shelters.

*Id.* at 2. He "brings this '*Bivens* Action' under the United States Constitution because the governmental officials wielding that 'absolute taxing power' failed to 'scrupulously observe' the laws and his constitutional rights that, in the words of Justice Brandeis, are 'commands' to all other citizens, and instead engaged in a vendetta to severely penalize all persons who they perceived as abusive tax shelter promoters." *Id.* at 2-3 (footnote omitted).

He alleges a first cause of action for violation of his Fifth Amendment rights "against Defendants Halpert, Meyer, and McCaskill. each in their individual capacities" for, "individually and jointly and in collusion and conspiracy with each other and others currently unknown to Plaintiff, acting at all relevant times under federal authority and under color of federal law, wrongfully and unlawfully violated Canada's constitutional rights as herein alleged under the Fifth Amendment to the Constitution of the United States, specifically Canada's right to due process of law with regard to property or liberty deprivations by the Federal Government." *Id.* at 43. And he asserts that "[t]he agents employed by the IRS, Defendants Halpert, Meyer, and McCaskill, due to the actions detailed herein, are individually liable to Canada for a violation of his Fifth Amendment rights, specifically as to due process of law"; that "[t]heir actions were unreasonable in all respects and without regard to the clear requirements of applicable statutes"; that "[t]he Individual Defendants, and each of them, caused Canada to be deprived of rights, privileges, and immunities secured to him by the Fifth Amendment of the Constitution of the United States and laws enacted

-4-

thereunder when he was subjected to a baseless $40 million claim by reason of their actions and conduct, jointly and individually and taken separately or in collusion or conspiracy, that drove him into bankruptcy and caused him financial, emotional, and physical injuries, as detailed herein"; and that, "[t]herefore, the Individual Defendants employed by IRS, and each of them, are liable to Canada for federal constitutional torts pursuant to *Bivens v. Six Unknown-Named Agents*, 403 U.S. 388 (1971) and *Rutherford v. United States*, 702 F.2d 580, 584 (5th Cir. 1983)." *Id.* at 43-44.

According to the Amended Complaint,

[b]eginning sometime in the mid-2000's, IRS officials, specifically including Halpert, Meyer, and McCaskill, formulated, implemented, and began pursuing an extremely aggressive and retaliatory policy and practice designed solely to severely penalize and punish all individuals such as Plaintiff that they considered to be (or to have been) "tax shelter organizers". That policy was retaliatory because of the extreme animus and hostility those officials had for individuals who were (or who had been) involved in devising and marketing tax planning strategies that the IRS later deemed abusive and ineffective shelters even though those strategies and plans technically complied with the tax laws in effect at the times in question. Those officials, including each of the Individual Defendants, personally benefitted by pursuing that policy by advancing their careers and status within the IRS through extolling their success within the service in collecting large settlements from numerous citizens who were unable to contest their actions in court and had no option but to settle the IRS claims in order to avoid IRS tax liens and other collection actions.

That policy was effective and successful due to the ability of IRS agents, including Halpert, Meyer, and McCaskill, all acting collusively and jointly under authority of the federal tax laws at all relevant times, to assess astronomical "failure to file" penalties against the individuals they targeted regardless of the merits of the agency action or the language and provisions of the laws they were responsible for enforcing fairly and with integrity.

The IRS agents had the power to arbitrarily and without justification assess exorbitant civil tax penalties against those individuals regardless of whether the assessed penalties were valid under the tax

laws and regardless of whether they were correctly calculated under those laws. The IRS officials pursued that abusive policy and practice because they knew that the "targets" of those assessments could not effectively challenge those assessments in court or through internal IRS appeals and would be coerced into large monetary settlements to salvage their reputations and financial lives. In short, the IRS agents knew that the individuals it targeted would have no choice but to accede to the IRS's demands since those individuals had no judicial remedy to protect themselves from the IRS's abusive or unmeritorious assessments. Moreover, because the "failure to register" penalty chosen by the IRS officials to effect that punitive policy had no statute of limitations, they could assess the abusive and wrongful penalties whenever they chose and, in this case, they waited more than a decade to notify Plaintiff of their proposed penalty assessment.

Plaintiff was a victim of the IRS's abusive and retaliatory policy. In this case, the IRS and the Individual Defendants sought to extort millions of dollars from Plaintiff by proposing to assess civil tax penalties in excess of $40 Million against him and advising Plaintiff and his tax counsel that the penalty assessment could not be challenged in court or judicially reviewed unless he first paid the proposed tax penalty in full, knowing full well that Plaintiff did not have the financial resources to pay the exorbitant but wrongful penalty. The IRS and the Individual Defendants thereby maliciously and intentionally wielded their taxation power to deprive Plaintiff of any judicial review of its actions and assessment. The Individual Defendants wielded the IRS taxation power to deprive Plaintiff of his constitutional right of due process under the Fifth Amendment before being deprived of his liberty or his property. The IRS and the Individual Defendants wielded their taxation power in complete disregard of the professed "mission" of the IRS to "enforce the tax laws with integrity and fairness".

There is no question that the IRS and the Individual Defendants severely harmed Plaintiff by targeting him under their "failure to register" penalty policy and practice. There is also no question that Plaintiff was improperly and wrongfully targeted. The actions of the Individual Defendants forced Plaintiff into a personal bankruptcy case that damaged him financially, emotionally, and physically. Two highly respected federal judges in well written opinions found that Plaintiff was not liable for the IRS penalty under the plain language of the tax statutes that the Individual Defendants relied upon – judicial determinations that Plaintiff was able to obtain only because the bankruptcy case that he had to file to defend himself against the abusive and exorbitant penalties proposed by the IRS.

The IRS's disregard for Plaintiff's rights continued even after he

filed bankruptcy. The IRS filed a "priority" claim in Plaintiff's bankruptcy case for the entire $40 Million tax penalty even though the bankruptcy laws did not provide for such priority. The IRS attempted to actually "assess" the proposed civil tax penalty after Plaintiff's bankruptcy filing and without seeking relief from the automatic stay imposed by the bankruptcy filing in a wrongful effort to acquire tax liens on Plaintiff's properties notwithstanding his bankruptcy case.

Plaintiff objected to the claim of the IRS and the Bankruptcy Court, following a two-day evidentiary hearing, denied the IRS claim and determined that the proposed penalties were invalid and did not apply to Plaintiff. The Bankruptcy Court further determined that even if the civil tax penalties had been applicable to Plaintiff, he possessed a "reasonable cause" defense to the assessments under the tax statutes. The Bankruptcy Court's decision was affirmed by the United States District Court. The IRS did not further appeal to the Court of Appeals.

*Id.* at 3-6 (footnotes omitted).

Canada contends that he "has been severely damaged as a result of the intentional, malicious, wrongful, and constitutionally tortious actions and omissions of the IRS and the Individual Defendants" and that, "[a]cting at all relevant times under federal authority, the Individual Defendants deprived Plaintiff of his constitutional rights to due process under the Fifth Amendment." *Id.* at 6.

Canada asserts that he "brings this '*Bivens* Action' against Individual Defendants on account of such wrongful, malicious, and unconstitutional conduct and the constitutional torts committed by the Individual Defendants that are not covered by the Federal Tort Claims Act and for which Plaintiff has no other adequate or available remedy or redress." *Id.* Canada "files this case as a result of the actions of the IRS and the Individual Defendants in asserting against him a meritless penalty claim in an exaggerated amount in excess of $40 million because the company he once worked for (but never owned or controlled) failed to file a two-page form some 17 years

earlier" and asserts that

> [t]his case is timely brought under all applicable statutes of limitations and any extensions of such limitations periods under 11 U.S.C. § 108 by reason of Plaintiff's bankruptcy filing on September 15, 2015.
>
> In this case, the IRS, Halpert, Meyer, and McCaskill, all acting jointly and collusively under federal authority and color of federal law, knowingly, maliciously, and without substantial justification deprived Canada of due process of law by asserting an exorbitant penalty amount in order to extort and coerce a settlement from Canada even though Canada was not liable for the proposed penalties (as subsequently found by two federal courts for the reasons set forth herein). As a result of such joint and conspiratorial actions, Canada was forced to file personal bankruptcy and has suffered financial damages, emotional distress, mental anguish, and physical injuries, as set forth herein.
>
> Upon information and belief, all of the actions and omissions of the Individual Defendants were retaliatory, vindictive, and taken purely to punish and penalize Canada, or were taken to further and advance each of the Individual Defendants' careers within the IRS at the expense and to the detriment of Canada, and were not pursued to recover any loss or taxes actually suffered by the government on account of any tax strategies in which Canada was involved. Canada's alleged "sin" that subjected him to the $40 Million penalty assessed by the IRS was his failure in 1998 to file a two-page form to register with the IRS those tax strategies and thereby provide information regarding the taxpayers using or implementing those strategies – a "sin" of which he was completely exonerated by the Bankruptcy and District Courts in their decisions denying the IRS penalty claims. However, and reflective of the purely vindictive and punitive nature of the actions of the IRS and the Individual Defendants, the IRS had already received that same information from Canada's employer many, many years before it proposed the $40 Million penalty assessment and was not deprived of that information due to any actions or omissions by Canada. Canada further believes that all of the taxpayers who implemented the tax strategies in which he was involved during 1998 – 2001 had already been audited or reviewed by the IRS and had resolved and paid all additional taxes or tax deficiencies (and possibly their own tax penalties) attributable to those strategies by the time the IRS proposed penalizing Canada $40 Million.

*Id.* at 8-9 (footnote omitted).

Canada additionally "seeks recovery of his reasonable and necessary attorney's

fees and other expenses from the IRS under the Equal Access to Justice Act (28 U.S.C. § 2412(b) and (d)) or the Internal Revenue Code (26 U.S.C. § 7430) because the position of the IRS in proposing and assessing civil tax penalties against Plaintiff was not substantially justified, because the IRS would be liable for such fees at common law, and because Plaintiff was the prevailing party in both the Bankruptcy Court and the District Court in the litigation regarding such penalty claims." *Id.* at 6-7. Canada specifically alleges as his second cause of action, labeled "Equal Access to Justice or Internal Revenue Code Claims Against IRS," that, where,

> [b]y reason of the foregoing actions, omissions, events, and circumstances, as the prevailing party in the contested matter as to the IRS's civil tax penalty assessment and claims, Canada is eligible and entitled to recover from the IRS reasonable attorney's fees, costs, and expenses incurred in such contested matter and in his Chapter 11 bankruptcy case under either The Equal Access to Justice Act (28 U.S.C. § 2412(b) or (d)) or the Internal Revenue Code (26 U.S.C. § 7430). The amount of such attorney's fees, costs, and expenses and the billing detail of Canada's attorney pertaining thereto are contained in the First and Final Fee Application of John P. Lewis, Jr. for Allowance of Compensation and Reimbursement of Expenses as Chapter 11 Counsel for Debtor (ECF Docket No. 204 in Bankruptcy Case No. 15-33757-bjh-11) filed on April 10, 2017, in Canada's bankruptcy case and approved by the Bankruptcy Court on May 9, 2017 (ECF Docket No. 218), which fee application and order are incorporated herein by reference thereto the same as if attached hereto or set out herein in full verbatim. Moreover, to the extent required or necessary, Canada requests the Court to take judicial notice of the foregoing application and order that appear of public record in Canada's bankruptcy case in this District.
>
> Based upon the record in the contested matter and during the appeal of the Bankruptcy Court's order to the District Court, the position of the IRS was not substantially justified and there are no special circumstances that would make an award of attorney's fees, costs, and expenses unjust. In the alternative, Canada is entitled to recover his attorney's fees under the common law theories of "common benefit" and "bad faith."

*Id.* at 45.

Canada further asserts that he lacks remedies other than this *Bivens* action,

where,

> [a]lthough courts have often times referred to the comprehensive remedial scheme available to taxpayers to challenge an IRS assessment, the remedies of that scheme were not available to protect Canada. He did not have a statute of limitations to protect him, nor any way to effectively contest the outrageous penalty sought against him other than to file bankruptcy.
>
> Canada's only options to contest the penalty (either on the merits or as to the proper and correct amount) were to pay the penalty and file a refund action or to seek review of any decision by the IRS Appeals Division. Canada could not afford to pay the outrageous amount of penalty the IRS threatened to assess and which it had absolute control over the amount of – over $40 million – and this was well known to the IRS; thus, the avenue of a refund action was unavailable. Nor was the "remedy" of appeal to the IRS Appeals division an effective remedy, as Canada's counsel had been told that Appeals had affirmed in whole 100% of previous penalty assessments and by that point, the IRS would have been in a position to lien Canada's property, a lien that would encumber Canada's exempt property even if he discharged the penalty through a bankruptcy proceeding. This left Canada in the position of having to file bankruptcy and suffering the adverse consequences of such a drastic proceeding in order to simply contest the penalty before the IRS would take all of his property.
>
> Likewise, the provisions of the Federal Tort Claims Act are explicitly not applicable to actions involving abuse of the IRS and taxpayers. *See* 28 U.S.C. § 1346. Thus, Canada has no effective remedy to contest the outrageous penalty asserted against him without any due process of law, nor to seek damages under the FTCA for the harms he has thereby suffered.
>
> In this case, Congress has not provided Canada with any alternative remedy explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective. As a result, Canada is entitled to bring this action and the claims asserted herein.

*Id.* at 36-37 (footnote omitted).

As to his alleged damages, Canada contends that "[t]he actions of the Individual

Defendants as detailed throughout this Complaint have damaged Canada in his property and liberty in, inter alia, the following ways":

    a. Canada has incurred to date over $100,000 in legal fees and expenses directly related to contesting the IRS's penalty claim against him;

    b. Canada has incurred over $50,000 in additional legal fees and related expenses due to being required to filing a bankruptcy proceeding as a result of the IRS's penalty claim against him, the vast majority of which was spent dealing with the IRS's repeated objections to every;

    c. Canada, a practicing lawyer, has spent innumerable hours away from his practice due to the IRS's penalty claim against him and in dealing with the requirements of the bankruptcy, which was brought about solely due to the actions of the IRS;

    d. Canada has suffered damages to his credit reputation, including the ruination of his credit and the cancellation of all credit cards in his name, even those that were fully paid off;

    e. Canada has always been an extremely private individual when it comes to his financial matters but because of the bankruptcy has been required to disclose all those matters publicly, as well as suffer the humiliation of having to disclose the bankruptcy to numerous people and even to many he doesn't even know (since prior to confirmation of a plan he was required to write all checks out of a "debtor-in-possession" account and each check form that account is required to reflect that Canada is in bankruptcy);

    f. Canada has incurred emotional distress and pain and suffering from the actions of the IRS. Physical manifestations of this suffering have included stress, lack of sleep, moodiness and periods of anger, and inability to concentrate; and

    g. Within a few months after the assertion of the IRS Claim, Canada learned that he had developed "paroxysmal atrial fibrillation," an irregular heartbeat where the heart goes in and out of normal sinus rhythm on its own. Canada has no identifiable physical condition that would cause this condition and has no previous history of any irregular heartbeat. People with atrial fibrillation are at an increased risk of forming a blood clot in the heart, which can travel to the brain, causing a stroke, or to other parts of the body. In addition, as they get older, paroxysmal atrial fibrillation may become persistent atrial fibrillation, where the heart does not on its own return to regular sinus rhythm. As a result, Canada has been required to take an expensive prescription blood thinner, Xarelto, to lower his chance of having a stroke by helping to prevent clots from forming. However, taking Xarelto may cause Canada to have an increased chance of bleeding, including in the brain.

> In addition, he may at some point be required to undergo surgical treatment to seek to correct the condition before it becomes permanent. Canada alleges on information and belief that the sudden development of this condition is the result of dealing with the stress of the IRS's sudden and unexpected efforts to take away from him, at the age of 60, all his assets and income through the age of 70, leaving him nothing with which to support his family or for retirement.

*Id.* at 37-38 (footnote omitted).

Canada asserts that certain "practices and policies and the actions of the Individual Defendants violate a clear and established constitutional right – the right to due process before being deprived of your life, liberty, or property"; that "[t]he Individual Defendants knowingly, maliciously, with gross negligence, and in deliberate indifference to the constitutional rights of its citizens, and in this instance Canada, engage in the foregoing wrongful and unconstitutional practices and policies in order to perpetrate and effect the types of wrongs set forth herein," although "[t]he Fifth Amendment to the United States Constitution provides in relevant part that no person shall 'be deprived of life, liberty, or property, without due process of law'"; and that, "[a]s shown herein, the cumulative effect of the actions of the Individual Defendants was to seek to coerce from Canada the maximum amount possible, without any due process, in total and arbitrary disregard of the previous pronouncements of the IRS and the actual amount of penalty, if any, that might actually be owed pursuant to the terms of the applicable statute; even though Canada was able to avoid losing all of this assets by filing bankruptcy and defeating the IRS's claimed penalty, he has not yet been made whole for the financial consequences of doing so and has in addition suffered serious deprivations of his liberty interests as a result, as set out herein." *Id.*

at 41-42.

More specifically, Canada alleges that "[t]he actions of the Halpert, Meyer, and McCaskill and the damages to Canada, as detailed throughout this [Amended] Complaint, are the result of (at least) the following intentional policies, practices, and procedures, both individually and in the aggregate, that Individual Defendants implemented under federal authority in violation of Plaintiff's constitutional rights to due process":

a. A practice and policy of utilizing (i) the lack of any pre-assessment means to determine the proper penalty, if any, and (ii) refusing to consider the merits of the controversy until the appeals level (and telling taxpayers that Appeals had always affirmed 100% of any penalty assessments), to deprive individual taxpayers of any effective forum to argue the merits of any proposed penalty assessment, so that the IRS can thus engage in efforts to coerce from individual taxpayers the maximum amount that can be coerced from them, without consideration of whether any amount is actually owed or if so, what amount;

b. A practice and policy of mis-calculating the 6111 "tax ratio" (by ignoring virtually all amounts to thereby meet the 2:1 test) and the 6707 penalty (by including all amounts, despite the statutory language to include only the "aggregate amount invested"), thus skewing the results in a way that, as Judge Houser put it, seems "designed to be most fair to the IRS and unfair to the taxpayer." *See also JZ Buckingham Investments LLC v. United States*, 78 Fed. Cl. 15, 20-21 (2007) ("If there is evidence that the IRS was inconsistent in how it treated the transactions behind the tax benefits, or how it interpreted sections of the I.R.C., such could indeed be relevant to Plaintiff's claim."); *In re COBRA TAX SHELTER LITIGATION.*, 2007 WL 5297169 (S.D. Ind.) ("the IRS's inconsistent positions are relatively well-known among tax litigators.");

c. A practice and policy of ignoring the statutory provisions and plain language of Sections 6111 and 6707, as they existed prior to the 2004 amendments, and instead combining transactions that were not similar and interpreting other explicit statutory terms such as, for example, "deductions and credits" as "tax benefits" or "losses" to seek to bring transactions within Section 6111's requirements when those transactions are not subject to the statute;

d. A practice and policy of disregarding, ignoring, or intentionally

misapplying and misreading the IRS's own Temporary Treasury Regulations promulgated years earlier as to, among other things, what "investments" were within Section 6111's registration requirements and how "deductions and credits" and "tax shelter ratios" were to be calculated and determined for purposes of the statute;

e. A practice and policy of ignoring the explicit language of the Bankruptcy Code, such as the automatic stay provision, the provisions related to what claims are entitled to priority payments, and the provisions related to what claims can be discharged; and

f. Most importantly, a practice and policy of utilizing all of the foregoing practices and policies in combination to coerce from the individual taxpayer the maximum amount possible, without regard to providing due process, being consistent with previous pronouncements of the IRS, or the actual amount of penalty, if any, that might actually be owed pursuant to the terms of the applicable statute.

*Id.* at 38-40 (footnotes omitted). Canada contends that these alleged actions "satisfy the [United States Court of Appeals for the] Fifth Circuit's statements in *Rutherford v. United States*, 702 F.2d 580, 584 (5th Cir.1983), that a 'Bivens claim' invokes liability against the individual federal agents employed by the IRS where there has been 'a lawless and arbitrary vendetta fueled by the power of the state, designed to harass by unwarranted intrusion into the minutia of their financial affairs, and intended to abuse by the creation of palpably unfounded claims against their property which they can set to right only by unnecessary litigation.'" *Id.* at 42.

## Legal Standards

I.      Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). As such, the Court must dismiss a

complaint for lack of subject-matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)). The Court will not assume it has jurisdiction. Rather, "the basis upon which jurisdiction depends must be alleged affirmatively and distinctly and cannot be established argumentatively or by mere inference." *Getty Oil Corp. v. Ins. Co. of N.A.*, 841 F.2d 1254, 1259 (5th Cir. 1988) (citing *Ill. Cent. Gulf R. Co. v. Pargas, Inc.*, 706 F.2d 633, 636 & n.2 (5th Cir. 1983)).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist" in any case originally filed in federal court. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted). And where, like here, a defendant files a Rule 12(b)(1) motion to dismiss, the Court need look only to the sufficiency of the allegations of the plaintiff's complaint, or on the complaint as supplemented by undisputed facts, all of which are presumed to be true. *See, e.g., Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming*, 281 F.3d at 161. "This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice. The court's dismissal of a plaintiff's case because the plaintiff lacks subject matter jurisdiction is

not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Id.* (citations omitted).

II.    Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion, the Court must "accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). To state a claim upon which relief may be granted, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

While, under Federal Rule of Civil Procedure 8(a)(2), a complaint need not contain detailed factual allegations, a plaintiff must allege more than labels and conclusions, and, while a court must accept all of a plaintiff's allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*,

-16-

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id.* But, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, a plaintiff need only "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that Plaintiff contends entitle him or her to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. ____, 135 S. Ct. 346, 347 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)).

The Supreme Court of the United States "has made clear that a Rule 12(b)(6) motion turns on the sufficiency of the '*factual* allegations' in the complaint," *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson*, 135 S. Ct. at 347; emphasis added by *Smith*), and the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted," *Johnson*, 135 S. Ct. at 346.

A court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). While pleadings in this context include attachments to the complaint, *see Katrina*, 495 F.3d at 205 (5th Cir. 2007), documents "attache[d] to a motion to dismiss are considered to be part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

"[D]ocuments are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011). But a court "may not incorporate [ ] into the complaint ... a document referenced in the plaintiff's complaint [that] is merely evidence of an element of the plaintiff's claim." *Id.*

And "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record," *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2008). In addition, "[t]here is nothing improper about the district court considering the content of briefing that supports or opposes a motion under Rule 12(b)(6) when deciding such a motion," where, although "[w]hen matters outside the pleadings are presented to the court in connection with a motion under Rule 12(b)(6), the motion must be treated as a Rule 56 motion for summary judgment and appropriate notice given to the parties," the United States Court of Appeals for the Fifth Circuit has held "that briefs and oral arguments in connection with the motion ... are not considered matters outside the pleadings for purposes of conversion." *Turnage v. McConnell Techns., Inc.*, 671 F. App'x 307, 309 (5th Cir. 2016) (per curiam) (internal quotation marks and citations omitted).

"A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th

Cir. 2003).

## Analysis

In their Second MTD, Defendants argue that the Court should dismiss all of Plaintiff's claims in his Amended Complaint: (1) the *Bivens* claims against the Individual Defendants and (2) the claim for attorneys' fees, costs, and expenses against the IRS under either the Equal Access to Justice Act or the Internal Revenue Code.

For the reasons discussed below, the undersigned concludes that the Court should grant Defendants' Second MTD and dismiss Plaintiff's claims in his Amended Complaint with prejudice.

## I.    Claims Against the Individual Defendants

Defendants first assert that this Court lacks subject matter jurisdiction over Canada's damages claims against Halpert, McCaskill, and Meyer (collectively, the "Individual Defendants") because (1) there is no constitutional damage cause of action with respect to assessment of federal taxes; (2) to the extent that Canada alleges a damages cause of action, that action can only be brought against the United States and not against the Individual Defendants; and (3) even if this Court had jurisdiction over Canada's alleged causes of action against the Individual Defendants, the Individual Defendants are entitled to qualified immunity from suit.

### A.    Jurisdiction and the applicable rules

As an initial matter, Canada does not allege a *Bivens* actions for damages against the United States, so Defendants' reliance on case law prohibiting such an action is misplaced.

Canada's federal constitutional claim brought against the Individual Defendants as a *Bivens* action may support federal question jurisdiction under 28 U.S.C. § 1331 if such a remedy is otherwise permitted. *See Seibert v. Baptist*, 594 F.2d 423, 429 (5th Cir. 1979) ("The final basis for jurisdiction asserted by the plaintiff, and the one which is by far the most complex is the general federal question jurisdiction of 28 U.S.C. § 1331. This statute provides the jurisdictional basis for civil actions which arise under the Constitution, laws, or treaties of the United States. Since, as indicated previously, there is no statutory authorization for damage claims against IRS officials, a cause of action supportable under § 1331 would have to be one which arises under the Constitution of the United States. Plaintiff has made such an 'arising under' claim by virtue of his allegation that he was denied the due process and equal protection guaranteed to him by the fifth amendment to the Constitution." (footnote omitted)). The Fifth Circuit's decision in *Mack v. Alexander*, 575 F.2d 488, 489-91 (5th Cir. 1978), on which Defendants rely, does not hold to the contrary where Canada invokes a *Bivens* remedy and not 42 U.S.C. § 1983, and the Fifth Circuit's decision in *Seibert* followed and discussed the holdings in *Mack* before concluding that the court there had Section 1331 jurisdiction under similar circumstances.

There is a difference between a meritless federal constitutional claim and one over which the Court does not even have subject matter jurisdiction – although it is well established that the mere mention of federal law or bare assertion of a federal claim is not sufficient to obtain federal question jurisdiction, because "federal courts are without power to entertain claims otherwise within their jurisdiction if they are so

attenuated and unsubstantial as to be absolutely devoid of merit; wholly insubstantial; obviously frivolous; plainly unsubstantial; or no longer open to discussion." *Hagans v. Levine*, 415 U.S. 528, 536-37 (1974) (internal citation and quotation marks omitted); *see Murphy v. Inexco Oil Co.*, 611 F.2d 570, 573 (5th Cir. 1980) ("[T]he assertion that the claim involves [a federal] question must be more than incantation."); *Raymon v. Alvord Indep. Sch. Dist.*, 639 F.2d 257, 257 (5th Cir. Unit A Mar. 1981) ("[A] complaint that alleges the existence of a frivolous or insubstantial federal question is not sufficient to establish jurisdiction in a federal court." (citing *Olivares v. Martin*, 555 F.2d 1192, 1195 (5th Cir. 1977); *Hagans*, 415 U.S. at 538-39)); *Southpark Square Ltd. v. City of Jackson, Miss.*, 565 F.2d 338, 342 (5th Cir. 1977) (a claim "must be more than frivolous to support federal question jurisdiction").

And the Fifth Circuit has treated dismissal of *Bivens* actions where no such remedy lies against defendants under the particular circumstances as properly dismissals under Rule 12(b)(6), *see Hernandez v. Mesa*, 885 F.3d 811, 814-15 (5th Cir. 2018) (en banc); *Zuspann v. Brown*, 60 F.3d 1156, 1160-61 (5th Cir. 1995) – as has the Supreme Court, *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1852-54 (2017).

Similarly, "Rule 12(b)(1) is not a proper vehicle to assert dismissal on grounds of qualified immunity" – rather, "[t]he Fifth Circuit has held that the defense of qualified immunity should be analyzed under a Rule 12(b)(6) motion to dismiss or a Rule 56 motion for summary judgment." *Richard v. Capps*, No. 3:07-cv-138-M(BH), 2007 WL 2428928, at *2 (N.D. Tex. Aug. 28, 2007) (citing *Baker v. Putnal*, 75 F.3d 190,

197 (5th Cir. 1996)).

But even if Defendants' arguments sound more properly in Rule 12(b)(6) as a motion for failure to state a claim, Canada does not complain that the Second MTD is mislabeled and in fact discusses and applies Rule 12(b)(6) standards in his response. Further, where Defendants did not attach any evidence to their Second MTD, there is no prejudice to Canada in considering Defendants' arguments under the appropriate Rule 12(b) standard.

B.   <u>Whether *Bivens* should be extended to the claim alleged here</u>

As the Fifth Circuit, sitting en banc, recently explained, the Supreme Court in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), made clear that, where "[n]o federal statute authorizes a damages action ... [against] a federal ... officer under [the] circumstances," and "[t]hus, plaintiffs' recovery of damages is possible only if the federal courts approve a *Bivens* implied cause of action,"

> *Abbasi* instructs us to determine initially whether these circumstances present a "new context" for *Bivens* purposes, and if so, whether "special factors" counsel against implying a damages claim against an individual federal officer. To make these determinations, we review *Abbasi*'s pertinent discussion about "*Bivens* and the ensuing cases in [the Supreme Court] defining the reach and the limits of that precedent." *Abbasi*, 137 S. Ct. at 1854.
>
> In *Abbasi*, the Court begins by explaining that when Congress passed what is now 42 U.S.C. § 1983 in 1871, it enacted no comparable law authorizing damage suits in federal court to remedy constitutional violations by federal government agents. In 1971, the *Bivens* decision broke new ground by authorizing such a suit for Fourth Amendment violations by federal law enforcement officers who handcuffed and arrested an individual in his own home without probable cause. Within a decade, the Court followed up by allowing a *Bivens* action for employment discrimination, violating equal protection under the Fifth

Amendment, against a Congressman. [*See Davis v. Passman*, 442 U.S. 228 (1979).] The Court soon after approved a *Bivens* claim for constitutionally inadequate inmate medical care, violating the Eighth Amendment, against federal jailers. [*See Carlson v. Green*, 446 U.S. 14 (1980).] According to the Court in *Abbasi*, these three cases coincided with the "*ancien regime*" in which "the Court followed a different approach to recognizing implied causes of action than it follows now."

The "*ancien regime*" was toppled step by step as the Court, starting in the late 1970s, retreated from judicially implied causes of action and cautioned that where Congress "intends private litigants to have a cause of action," the "far better course" is for Congress to confer that remedy explicitly. *Abbasi* acknowledges that the Constitution lacks as firm a basis as congressional enactments for implying causes of action; but the "central" concern in each instance arises from separation-of-powers principles. Consequently, the current approach renders implied *Bivens* claims a "disfavored" remedy. The Court then lists the many subsequent cases that declined to extend *Bivens* under varying circumstances and proffered constitutional violations.

*Hernandez v. Mesa*, 885 F.3d 811, 815-16 (5th Cir. 2018) (en banc) (footnotes and citations omitted); *see also id.* at 816 n.16 ("'Indeed,' the Court states, its current approach suggests the possibility that the analysis in the three *Bivens* cases providing a damage remedy 'might have been different if they were decided today.' *Abbasi*, 137 S. Ct. at 1856."). "*Abbasi* is grounded in the conclusion that *Bivens* claims are now a distinctly 'disfavored' remedy and are subject to strict limitations arising from the constitutional imperative of the separation of powers." *Id.* at 818; *see also Abbasi*, 137 S. Ct. at 1855 ("These three cases – *Bivens*, *Davis*, and *Carlson* – represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."); *id.* at 1857 ("This is in accord with the Court's observation that it has 'consistently refused to extend *Bivens* to any new context or new category of defendants.' *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68, 122 S. Ct. 515, 151

L. Ed. 2d 456 (2001). Indeed, the Court has refused to do so for the past 30 years.").

The Court of Appeals then explained that "*Abbasi* goes on to reiterate with an exacting description the two-part analysis for implying *Bivens* claims." *Id.* at 816. And the en banc *Hernandez* decision – on an appeal of a Rule 12(b)(6) motion to dismiss ruling under which the Court of Appeals took the alleged facts as true, *see* 885 F.3d at 814 – makes clear that the Court must engage in this analysis of its own accord and that, if any party bears a burden of persuasion in this analysis, it is the plaintiff seeking to pursue a *Bivens* remedy, *see, e.g.*, *id.* at 816 ("The plaintiffs assert that because the allegedly unprovoked shooting of a civilian by a federal police officer is a prototypical excessive force claim, their case presents no 'new context' under *Bivens*."); *id.* at 818 ("The plaintiffs assert that because this is just a case in which one rogue law enforcement officer engaged in misconduct on the operational level, it poses no 'new context' for *Bivens* purposes."); *id.* ("The plaintiffs argue that this case involves no 'special factors' – no reasons the court should hesitate before extending *Bivens*."); *id.* at 823 ("Having weighed the factors against extending *Bivens*, we conclude that this is not a close case. .... Similar 'consequences' are dispositive of the 'special factors' inquiry. The myriad implications of an extraterritorial *Bivens* remedy require this court to deny it.").

Under the required two-part analysis, the Court must first determine whether the alleged circumstances present a "new context" for *Bivens* purposes, which it may "despite similarities between 'the right and the mechanism of injury' involved in

previous successful *Bivens* claims." *Id.* at 816 (quoting *Abbasi*, 137 S. Ct. at 1859).

> The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1859-60; *see also id.* at 1864 ("As noted above, a case can present a new context for *Bivens* purposes if it implicates a different constitutional right; if judicial precedents provide a less meaningful guide for official conduct; or if there are potential special factors that were not considered in previous *Bivens* cases.").

"As *Abbasi* points out, the *Malesko* case rejected a 'new' *Bivens* claim under the Eighth Amendment, whereas an Eighth Amendment *Bivens* claim was held cognizable in *Carlson*; and *Chappell* rejected a *Bivens* employment discrimination claim in the military, although such a claim was allowed to proceed in *Davis v. Passman*." *Id.* (footnotes omitted). The *Abbasi* "Court explained that 'even a modest extension [of *Bivens*] is still an extension.'" *Id.* at 816 (quoting *Abbasi*, 137 S. Ct. at 1864).

"The proper inquiry is whether 'the case is different in a meaningful way' from prior *Bivens* cases." *Id.* at 816 (quoting *Abbasi*, 137 S. Ct. at 1859). And, the en banc Fifth Circuit explained, "[a]mong the non-exclusive examples of such 'meaningful'

differences, the [*Abbasi*] Court points to the constitutional right at issue, the extent of judicial guidance as to how an officer should respond, and the risk of the judiciary's disruptive intrusion into the functioning of the federal government's co-equal branches." *Id.* (quoting *Abbasi*, 137 S. Ct. at 1860-61). And this part of the analysis may permissibly overlap with the second part of the analysis where "*Abbasi* explicitly states that one rationale for finding a 'new context' is 'the presence of potential special factors.'" *Id.* at 822 (quoting *Abbasi*, 137 S. Ct. at 1860; emphasis omitted).

In *Hernandez*, the en banc Fifth Circuit explained that, in that case, "[t]he newness of this 'new context' should alone require dismissal of the plaintiffs' damage claims," but the Court of Appeals "[n]evertheless ... turn[ed] next to the 'special factors' analysis assuming arguendo that some type of constitutional claims could be conjured here." *Id.* at 818. Doing so appears to be consistent with and commanded by the *Abbasi* decision, which explained that

> [t]he differences between this claim and the one in *Carlson* are perhaps small, at least in practical terms. Given this Court's expressed caution about extending the *Bivens* remedy, however, the new-context inquiry is easily satisfied. Some differences, of course, will be so trivial that they will not suffice to create a new *Bivens* context. But here the differences identified above are at the very least meaningful ones. Thus, before allowing this claim to proceed under *Bivens*, the Court of Appeals should have performed a special factors analysis. It should have analyzed whether there were alternative remedies available or other "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" in a suit like this one. *Supra*, at 1859.

*Abbasi*, 137 S. Ct. at 1865.

As the en banc *Hernandez* court explained, under the second part of the analysis

– determining whether "special factors" counsel against implying a damages claim against an individual federal officer – the Court must consider whether there are "reasons the court should hesitate before extending *Bivens*," where "[t]he presence of 'special factors' precludes a *Bivens* extension." 885 F.3d at 822.

The Supreme Court noted in *Abbasi* that "[t]his Court has not defined the phrase 'special factors counselling hesitation'" but explained that "[t]he necessary inference [] is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed," such that, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." 137 S. Ct. at 1857-58; *see also id.* at 1858 ("In sum, if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III."). The Fifth Circuit explained in *Hernandez* that, under this analysis, "'[t]he only relevant threshold – that a factor 'counsels hesitation' – is remarkably low.'" *Hernandez*, 885 F.3d at 823 (quoting *De La Paz v. Coy*, 786 F.3d 367, 378 (5th Cir. 2015) (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc))); *accord Abbasi*, 137 S. Ct. at 1862 ("Even so, the question is only whether 'congressionally uninvited intrusion' is 'inappropriate' action for the Judiciary to take. *Stanley*, 483 U.S., at 683, 107 S. Ct.

3054. The factors discussed above all suggest that Congress' failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than 'inadvertent.' *Schweiker*, 487 U.S., at 423, 108 S. Ct. 2460. This possibility counsels hesitation 'in the absence of affirmative action by Congress.' *Bivens*, 403 U.S., at 396, 91 S. Ct. 1999.").

As to this second part of the analysis, "*Abbasi* clarifies the concept of 'special factors' by explicitly focusing the inquiry on maintaining the separation of powers: 'separation-of-powers principles are or should be central to the analysis,'" and *Abbasi* "instructs courts to 'concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1857-58). The en banc Fifth Circuit explained that, "[i]n light of this guidance, the question for this court is not whether this case is distinguishable from *Abbasi* itself – it certainly is – but whether 'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy,'" and, "[i]f such reasons exist, 'the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.'" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1858).

In *Hernandez*, the en banc Fifth Circuit held that "[a]pplying *Abbasi*'s separation-of-powers analysis reveals numerous 'special factors' at issue in this case," including that

Congress's failure to provide a damages remedy in these circumstances is an additional factor counseling hesitation. *Abbasi* emphasized that Congress's silence may be "relevant[ ] and ... telling," especially where "Congressional interest" in an issue "has been frequent and intense." [*Abbasi*, 137 S. Ct.] at 1862 (citations omitted). It is "much more difficult to believe that congressional inaction was inadvertent" given the increasing national policy focus on border security. [*Id.*] (citations omitted).

Relevant statutes confirm that Congress's failure to provide a federal remedy was intentional. For instance, in section 1983, Congress expressly limited damage remedies to "citizen[s] of the United States or other person[s] within the jurisdiction thereof." 42 U.S.C. § 1983. Given that *Bivens* is a judicially implied version of section 1983, it would violate separation-of-powers principles if the implied remedy reached further than the express one. Likewise, under the Federal Tort Claims Act – a law that comprehensively waives federal sovereign immunity to provide damages remedies for injuries inflicted by federal employees – Congress specifically excluded "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k). Congress also exempted federal officials from liability under the Torture Victim Protection Act of 1991. *See* 28 U.S.C. §§ 2671 *et seq.* Taken together, these statutes represent Congress's repeated refusals to create private rights of action against federal officials for injuries to foreign citizens on foreign soil. It is not credible that Congress would favor the judicial invention of those rights.

Nor, under *Abbasi*, does the plaintiffs' lack of a damages remedy favor extending *Bivens*. The Supreme Court has held that "even in the absence of an alternative" remedy, courts should not extend *Bivens* if any special factors counsel hesitation. *Wilkie*, 551 U.S. at 550, 127 S. Ct. at 2598. Thus, the absence of a remedy is only significant because the presence of one precludes a *Bivens* extension.

*Hernandez*, 885 F.3d at 820-21 (footnotes and emphasis omitted).

Further, "the legal theory itself may constitute a special factor if it is 'doctrinally novel and difficult to administer.'" *Id.* at 822 (quoting *Alvarez v. U.S. Immigration & Customs Enf't*, 818 F.3d 1194, 1210 (11th Cir. 2016)).

The Supreme Court in *Abbasi* also explained that "a *Bivens* action is not 'a proper vehicle for altering an entity's policy'" and that "a *Bivens* claim is brought

against the individual official for his or her own acts, not the acts of others." 137 S. Ct.

at 1860 (quoting *Malesko*, 534 U.S. at 74). And, where "claims would call into question

the formulation and implementation of a general policy," "[t]his, in turn, would

necessarily require inquiry and discovery into the whole course of the discussions and

deliberations that led to the policies and governmental acts being challenged," which

"consequences counsel against allowing a *Bivens* action against the Executive Officials,

for the burden and demand of litigation might well prevent them – or, to be more

precise, future officials like them – from devoting the time and effort required for the

proper discharge of their duties." *Id.*

> And, as noted in *Abbasi*,
>
> if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action. For if Congress has created "any alternative, existing process for protecting the [injured party's] interest" that itself may "amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, *supra*, at 550, 127 S. Ct. 2588; *see also Bush*, *supra*, at 385-388, 103 S. Ct. 2404 (recognizing that civil-service regulations provided alternative means for relief); *Malesko*, 534 U.S., at 73-74, 122 S. Ct. 515 (recognizing that state tort law provided alternative means for relief); *Minneci*, *supra*, at 127-130, 132 S. Ct. 617 (same).
> ....
> In sum, respondents had available to them "'other alternative forms of judicial relief.'" *Minneci*, 565 U.S., at 124, 132 S. Ct. 617. And when alternative methods of relief are available, a *Bivens* remedy usually is not. *See Bush*, 462 U.S., at 386-388, 103 S. Ct. 2404; *Schweiker*, *supra*, at 425-426, 108 S. Ct. 2460; *Malesko*, 534 U.S., at 73-74, 122 S. Ct. 515; *Minneci*, *supra*, at 125-126, 132 S. Ct. 617.

137 S. Ct. at 1858, 1863; *see also id.* at 1865 ("This case also has certain features that

were not considered in the Court's previous *Bivens* cases and that might discourage a

court from authorizing a *Bivens* remedy. As noted above, the existence of alternative remedies usually precludes a court from authorizing a *Bivens* action. *Supra*, at 1858-1859. And there might have been alternative remedies available here, for example, a writ of habeas corpus, *Wolfish*, 441 U.S., at 526, n.6, 99 S. Ct. 1861; an injunction requiring the warden to bring his prison into compliance with the regulations discussed above; or some other form of equitable relief.").

Canada makes a number of arguments in his sur-reply about this two-part analysis that can be addressed in short order.

First, Canada contends that "[t]he absence of direct '*Bivens*' authority for abusive penalty assessments by the IRS does not create any ambiguity as to whether the Fifth Amendment permits the government to confiscate private property without any due process whatsoever: The Fifth Amendment clearly bans this." Dkt. No. 30 at 3 n.3 (citing *Davis v. Passman*, 442 U.S. 228 (1979)). But, as the en banc Court of Appeals in *Hernandez* noted, "*Bivens* remedies are not 'coextensive' with the Constitution's protections." 885 F.3d at 822.

Second, Canada's sur-reply could be read to suggest that challenging the existence of a *Bivens* remedy under the test laid out in *Abbasi* is an affirmative defense on which Defendants bear the burden of proof and that must be rejected on a Rule 12(b)(6) motion so long as Canada's Amended and Restated Complaint does not plead allegations that "foreclose the existence of a *Bivens* remedy under the *Ziglar* test." Dkt. No. 30 at 6-7. For the reasons already explained above, the undersigned does not read

the scope of the analyses in *Abbasi* or *Hernandez* – both appeals of Rule 12(b)(6) dismissals – to be so limited or the question of whether the courts should approve a *Bivens* implied cause of action as Canada alleges to be the sort of affirmative defense – like exhaustion of administrative remedies – that may only be addressed and resolved against the plaintiff if a defendant raises it.

Third, Canada's sur-reply contends that, on the "special factors" analysis, Defendants bear the "burden of showing a 'convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" Dkt. No. 30 at 7. This, too, is contrary to *Abbasi*'s and *Hernandez*'s explanations of what qualify as "special factors" and against what standards those considerations are to be measured, as laid out above.

Turning, then, to the two-part analysis mandated by *Abbasi* and *Hernandez*, the first question is easily answered here: Canada's case is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court. Indeed, Canada only points to *Davis v. Passman*, 442 U.S. 228 (1979), which involved an employment discrimination claim under the Fifth Amendment's Equal Protection Clause. *Accord Abbasi*, 137 S. Ct. at 1860 ("In the present suit, respondents' detention policy claims challenge the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil. Those claims bear little resemblance to the three *Bivens* claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without a

warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma. *See Bivens*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619; *Davis*, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846; *Chappell*, 462 U.S. 296, 103 S. Ct. 2362, 76 L. Ed. 2d 586. The Court of Appeals therefore should have held that this was a new *Bivens* context. Had it done so, it would have recognized that a special factors analysis was required before allowing this damages suit to proceed.").

And, even if the Fifth Circuit's *Rutherford* decision could count under the test announced in *Abbasi* (although it seems it cannot), the Court of Appeals there did not actually hold that "the substantive aspects of the due process clause actually does create in taxpayers a liberty interest in freedom from abusive behavior of the kind, degree and effect as that attributed to" the IRS agent accused of violating the Rutherfords' "constitutional right to due process by willfully and maliciously assessing them for taxes they did not owe, harassing them into paying those taxes, and forcing them to sue for a refund." 702 F.2d at 581, 584. And *Rutherford* involved a different statutory mandate under which the officer was operating as to tax collection, as opposed to, here, assessment of civil tax penalties and so .

As to the second part of the analysis, while the en banc Court of Appeals in *Hernandez* suggested that, in that case, "[t]he newness of this 'new context' should alone require dismissal of the plaintiffs' damage claims," 885 F.3d at 818, the Supreme Court's decisions as explained and applied in *Hernandez* appear to require a court to

analyze whether any "special factors" counsel hesitation against implying a damages claim against an individual federal officer in a particular case in any case that presents a "new context" for *Bivens* purposes, *see Abbasi*, 137 S. Ct. at 1865; *Hernandez*, 885 F.3d at 815-16, 820-21.

Looking first at whether there were alternative remedies available, Defendants suggest that Canada's ability, provided by statute, to contest and seek a refund of the assessment of penalties in court after paying them is just such a remedy. *See* Dkt. No. 18 at 4 ("More importantly, where an alternative method of relief is available (here a refund action or, as utilized in the case at hand, a bankruptcy objection to the tax assessment), a *Bivens* remedy is usually not available."). Of course, it is not if the alleged constitutional violation that Canada seeks to redress is the right to challenge the assessment of a penalty – and the manner in which the Individual Defendants assessed it – without first paying the penalty or without "filing for bankruptcy and objecting to the IRS penalty claim to contest that penalty," Dkt. No. 20 at 10 – or, as Canada puts it, "the remedy of a pre-assessment action in tax court was unavailable to Canada," where, "[a]lthough in theory (if he had $40 million), Canada could have paid the $40 million penalty and then filed a refund claim, the IRS had total control of setting the amount of the penalty and, according to the Complaint (*see* ¶ 51, ¶ 56), did so at an exaggerated level to extort the maximum amount of money from Canada and to prevent him from being able to seek judicial review," Dkt. No. 30 at 10-11.

At oral argument, Defendants' counsel contended that two other special factors counsel hesitation here.

First, permitting a *Bivens* action against revenue officers and agents to challenge their manner of assessing tax penalties would risk disruptive intrusion by the courts into the functioning of Treasury Department's tax efforts. *See Baddour, Inc. v. United States*, 802 F.2d 801, 808 (5th Cir. 1986) ("Congress has given taxpayers all sorts of rights against an overzealous officialdom, including, most fundamentally, the right to sue the government for a refund if forced to overpay taxes, and it would make the collection of taxes chaotic if a taxpayer could bypass the remedies provided by Congress simply by bringing a damage action against Treasury employees. It is hard enough to collect taxes as it is; additional obstructions are not needed." (internal quotation marks omitted)).

Second, Defendants contend that Congress has addressed the assessment of tax penalties and has chosen not to enact a damages remedy. Defendants cite the Fifth Circuit's holding that a claim under 26 U.S.C. § 7433(a) is limited to instances of federal tax collection and that "a taxpayer cannot seek damages under § 7433 for an improper assessment of taxes." *Shaw v. United States*, 20 F.3d 182, 184 (5th Cir. 1994); *accord* 26 U.S.C. § 7433(a) ("Civil damages for certain unauthorized collection actions. (a) In general. – If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the Internal Revenue Service recklessly or intentionally, or by reason of negligence, disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States. Except as provided in section 7432, such civil action shall be the exclusive remedy for recovering

-35-

damages resulting from such actions."). According to Defendants, "it can be presumed that by enacting a damages remedy specifically with respect to tax collection (*see* 26 U.S.C. § 7433) and not tax assessment, Congress intended that no similar damages remedy be permitted." Dkt. No. 22 at 5.

And Defendants point to 26 U.S.C. § 7421(a)'s provision that, with the exception of certain exceptions inapplicable here, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).

Canada responds that Section 7421(a)'s scope is limited to suits seeking to restrain and enjoin tax assessment or collection – which this is not – and that the actual legislative history of Section 7433 suggests that "Congress omitted statutory relief against the IRS for constitutional injuries in Sec. 7433 .... with the explicit understanding that taxpayers already enjoyed a remedy for such injuries under *Bivens*." Dkt. No. 30 at 9-10. Canada asserts that, "'[w]here Congress decides to enact a statutory remedy which it views as fully adequate only in combination with the *Bivens* remedy... that congressional decision should be given effect by the courts'" and that "[t]his is even more true for Canada, whose claim relating to penalties is not cognizable at all under § 7433, which is expressly limited to actions arising 'in connection with any collection of Federal tax.'" *Id.* at 10 (quoting *Carlson*, 446 U.S. at 19 n.5). And, Canada asserts in his sur-reply,

[t]hat post-payment review is the only judicial review available for Sec.

> 6707 penalties creates perverse IRS incentives, which, in turn, encourages constitutional overreach, abuse, and violation. The IRS knows that judicial review of a Sec. 6707 penalty can only occur after the taxpayer pays the assessed penalty. Thus, to avoid judicial review, the IRS has an incentive to assess a large penalty, whether lawful or not, exceeding the taxpayer's financial resources. The IRS thereby effectively prices the taxpayer out of judicial review. Consequently, in the absence of a *Bivens* remedy, there is no incentive for IRS agents to comply with constitutional rights or other laws in assessing a Sec. 6707 penalty – to the contrary, by preventing judicial review through an excessive assessment that is beyond the taxpayer's financial means, the IRS is less likely to be held responsible for its actions, thus compounding the egregiousness of the constitutional violation of the taxpayer's property and due process rights.

Dkt. No. 30 at 4 (footnote omitted). Finally, Canada contends that, "as if anything more was needed to show that the 'remedy' of an IRS appeal is not equally as effective as a *Bivens* claim, there is pending legislation to create an independent IRS appeals division due to taxpayer concerns and disbelief that the existing IRS Appeals is truly independent." *Id.* at 11.

Even fully crediting these arguments, the Court should conclude that "special factors" counsel against extending *Bivens* (as the Court must here to permit Canada to proceed) to imply a damages claim under the Fifth Amendment Due Process Clause against the Individual Defendants. Canada seeks a damages remedy because the Individual Defendants allegedly engaged in an effort to assess exorbitant civil tax penalties against him regardless of whether the assessed penalties were valid under the tax laws and regardless of whether they were correctly calculated under those laws. In other words, he seeks to challenge the assessment of penalties through a damages action against the IRS agents, whom he admits were acting pursuant to federal tax

-37-

laws, based on an assertion that his constitutional rights to due process were violated because Congress provided by statute for only post-payment review and the Individual Defendants took advantage of that fact to run up the amount of assessed penalties to avoid judicial review. In other words, Canada is attempting to sue individual federal officers to go after what he believes to be an injustice inherent in the civil tax penalty system.

Under the remarkably low threshold that applies here, there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong as Canada alleges it. Congress has not enacted a damages remedy as to tax penalties assessment and has limited the statutory remedies to post-payment review. While the then-IRS Commissioner's testimony and a committee staff summary in the legislative record may have explained that a *Bivens* remedy was already available against IRS officials before Congress enacted a version of Section 7433 that did not provide a damages action for violations of federal law (as opposed to IRS regulations), that limited legislative history does not change the essential inference that, faced with the possibility of providing a damages remedy against IRS officials in connection with tax penalty assessment, Congress elected not to do so – and, in fact, chose not to write Section 7433(a) to cover actions as to assessment (as opposed to collection) at all. Canada concedes that *Rutherford* – based on a claim as to tax collection – would have been decided differently if Section 7433(a) had been enacted at the time that case was decided. But Congress's failures to enact anything but a post-payment review

mechanism as to assessment does not support the conclusion that it must have done so because it expected a *Bivens* action – never recognized by the Supreme Court or, apparently, any other federal court before – to be available.

For all of these reasons, the Court should conclude that *Bivens* should not be extended to Canada's alleged implied damages action against the Individual Defendants under the Fifth Amendment Due Process Clause.

C.    Whether the Individual Defendants are protected by qualified immunity

Even if the Court were to extend *Bivens* to imply a damages action against the Individual Defendants here as Canada alleges, "[q]ualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)); *accord Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

This "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); internal quotation marks omitted); *accord City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015); *see also Hanks v. Rogers*, 853 F.3d 738, 746-47 (5th Cir. 2017) ("A right may be clearly established without 'a case directly on point,' but 'existing precedent must have placed

the statutory or constitutional question beyond debate.'" (quoting *White*, 137 S. Ct. at 551)).

Review of a motion based on qualified immunity is accomplished in two steps, and, while a court may conduct the required two-step examination in any order, *see Pearson*, 555 U.S. at 236, "deciding the two prongs in order 'is often beneficial,'" *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017) (quoting *Pearson*, 555 U.S. at 236). But, regardless of which prong is addressed first, a court must decide "whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a federal constitutional or statutory right." *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014), *reversed on other grounds*, 136 S. Ct. 305 (2015). Put differently, under the first prong, a court simply must decide "whether the plaintiff has alleged a violation of a constitutional right." *Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008).

A court also must decide "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores*, 381 F.3d at 395. This second prong of the analysis requires a court to determine "whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident," *Charles*, 522 F.3d at 511 – that is, "whether it would have been clear to a reasonable officer in the [defendants'] position that their conduct was unlawful in the situation they confronted," *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001); internal quotation marks and brackets omitted from original)). The Court

cannot "define clearly established law at a high level of generality." *See al-Kidd*, 563 U.S. at 742, 131 S. Ct. 2074. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198-99, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)). The Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741, 131 S. Ct. 2074.

*Bustillos v. El Paso County Hosp. Dist.*, ___ F.3d ___, 2018 WL 2338812, at *4 (5th Cir. May 23, 2018).

"Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015); *see also Kinney*, 367 F.3d at 350. "Although a case *directly* on point is not necessary, there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Vincent*, 805 F.3d at 547; *see also Kinney*, 367 F.3d at 350. Thus, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Luna*, 136 S. Ct. at 308.

*Melton v. Phillips*, 875 F.3d 256, 265 (5th Cir. 2017) (en banc) (footnote omitted). As the *Abbasi* Court explained:

"[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. ___. ___, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (per curiam) (quoting *Ashcroft*, *supra*, at 742, 129 S. Ct. 1937).

It is not necessary, of course, that "the very action in question has previously been held unlawful." *Anderson*, *supra*, at 640, 107 S. Ct. 3034. That is, an officer might lose qualified immunity even if there is no reported case "directly on point." *Ashcroft*, *supra*, at 741, 129 S. Ct. 1937. But "in the light of pre-existing law," the unlawfulness of the officer's conduct "must be apparent." *Anderson*, *supra*, at 640, 107 S. Ct. 3034. To subject officers to any broader liability would be to "disrupt the balance

that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Davis v. Scherer*, 468 U.S. 183, 195, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984). For then, both as a practical and legal matter, it would be difficult for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Ibid.*

In light of these concerns, the Court has held that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). To determine whether a given officer falls into either of those two categories, a court must ask whether it would have been clear to a reasonable officer that the alleged conduct "was unlawful in the situation he confronted." *Saucier*, *supra*, at 202, 121 S. Ct. 2151. If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however – *i.e.*, if a reasonable officer might not have known for certain that the conduct was unlawful – then the officer is immune from liability.

137 S. Ct. at 1866-67.

On this analysis, "'[i]t is the plaintiff's burden to find a case in [her] favor that does not define the law at a 'high level of generality.'" *Bustillos*, 2018 WL 2338812, at *4 (quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 733 (5th Cir. 2016))); *see also id.* (affirming a Rule 12(b)(6) dismissal where the plaintiff "has not carried her burden of pointing this panel to any case that shows, in light of the specific context of this case, that the Doctors' or Nurses' conduct violated clearly established law. Further, our independent review has uncovered only one case, *Huguez*. Though we find the analysis in *Huguez* persuasive, and adopt it above, we are not persuaded that a single, fifty year old case from another circuit is sufficient in this instance to have 'placed the ... constitutional question [at issue] beyond debate.' *See Al-Kidd*, 563 U.S. at 741, 131 S. Ct. 2074.").

-42-

As soon as a defendant invokes his entitlement to qualified immunity, "the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam); *see Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014) ("Once the defendant raises the qualified immunity defense, 'the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.'" (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008))). "Despite this burden-shifting, all reasonable inferences must be drawn in the non-movant plaintiff's favor." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

Canada points to internal IRS manuals and a *Forbes* article, *see* Dkt. No. 20 at 18-19, but those are not the sort of clearly established law on which a qualified immunity defense turns. And Canada contends that "[t]he practices and policies and the actions of the Individual Defendants alleged in the Amended Complaint, and especially those reproduced in the Appendix, violate a clear and established constitutional right – the right to due process before being deprived of life, liberty, or property." *Id.* at 18. But crediting that assertion would be to define "clearly established law" at an impermissibly "high level of generality." *al-Kidd*, 563 U.S. at 742.

And Canada otherwise points for existing precedent only to *Rutherford*. But, the undersigned concludes above that that case is different in a meaningful way from Canada's, and there the Fifth Circuit did not actually hold that "the substantive

aspects of the due process clause actually does create in taxpayers a liberty interest in freedom from abusive behavior of the kind, degree and effect as that attributed to" the IRS agent accused of violating the Rutherfords' "constitutional right to due process. 702 F.2d at 581, 584. For those reasons, the undersigned concludes that *Rutherford* did not, at the time of the Individual Defendants' alleged conduct, place beyond debate the question of whether their alleged actions violated Canada's right to due process protections under the Fifth Amendment – even as he more specifically described those alleged constitutional violations in his Amended and Restated Complaint and response to the Second MTD. *See, e.g.*, Dkt. No. 14 at 8 ("In this case, the IRS, Halpert, Meyer, and McCaskill, all acting jointly and collusively under federal authority and color of federal law, knowingly, maliciously, and without substantial justification deprived Canada of due process of law by asserting an exorbitant penalty amount in order to extort and coerce a settlement from Canada even though Canada was not liable for the proposed penalties (as subsequently found by two federal courts for the reasons set forth herein)."); Dkt. No. 20 at 18-19.

The Court has before it no other authorities that place beyond debate that the Due Process Clause would be violated by, as Canada alleges, the Individual Defendants, under authority of the federal tax laws, having assessed "failure to file" penalties against individuals who were (or who had been) involved in devising and marketing tax planning strategies that the IRS later deemed abusive and ineffective shelters and having done so in such "astronomical" amounts that the individuals would be unable to contest the Individual Defendants' actions in court or through internal

IRS appeals and would have no option but to settle the IRS claims in order to avoid IRS tax liens and other collection actions. In short, the record does not support a determination that there was, at the relevant time, adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that the Individual Defendants' alleged conduct here was definitively unlawful or that the due process rights as alleged on the specific facts of this case is one that is sufficiently clear that every reasonable official would have understood – that is, that it would be apparent to every reasonable official – that what the Individual Defendants were allegedly doing violated that right.

Accordingly, even taking as true all of Canada's factual allegations in his Amended and Restated Complaint, the Court should dismiss with prejudice Canada's claims against the Individual Defendants based on their asserted defense of qualified immunity.

II.    26 U.S.C. § 7430 as Plaintiff's Exclusive Remedy for Attorneys' Fees

Plaintiff seeks attorneys' fees, costs, and expenses, under either Section 2412(b) or (d) of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(b) & (d), or Section 7430 of the Internal Revenue Code ("IRC"), 26 U.S.C. § 7430.

Defendants argue that "26 U.S.C. § 7430 is the exclusive provision authorizing an award of reasonable administrative and litigation costs (including attorney's fees) against the government in tax cases." Dkt. No. 18 at 14 of 17 (citing *Smith v. Brady*, 972 F.2d 1095, 1096 (9th Cir.1992)).

Plaintiff's response to the Second MTD does not counter Defendants' exclusivity

argument, but Plaintiff maintains in a footnote that he is entitled to attorneys' fees also under Section 2412(b).

"The EAJA provides two paths for recovering attorneys' fees from the government." *Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 559 (5th Cir. 2015). Plaintiff alleges in his Amended Complaint that he is entitled to attorneys' fees under either method:

> First, under 28 U.S.C. § 2412(b), the federal government may be liable for attorneys' fees "to the same extent that any other party would be liable under the common law." The general rule in federal courts and under the common law is that litigants are responsible for their own attorneys' fees. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257, 95 S. Ct. 1612, 1621, 44 L. Ed. 2d 141 (1975). Courts can, however, award attorneys' fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" or when a "litigant has conferred a substantial benefit on a class of persons." *F.D. Rich Co., Inc. v. U.S. ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129-30, 94 S. Ct. 2157, 2165, 40 L. Ed. 2d 703 (1974). Thus, § 2412(b) essentially applies these common-law bad faith and common fund exceptions to the government. *Baker v. Bowen*, 839 F.2d 1075, 1080 n.3 (5th Cir.1988). Second, 28 U.S.C. § 2412(d) allows courts to award attorneys' fees "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." Section 2412(d) does not apply to high net worth individuals or corporations and limits attorney compensation to $125 per hour absent special factors. 28 U.S.C. § 2412(d)(2)(A)-(B).

*Id.*

But a plaintiff cannot make a claim under either Section 2412(b) or (d) of the EAJA if Section 7430 of the IRC applies to the plaintiff's claim for attorneys' fees. The EAJA's fee-recovery provisions explicitly do "not apply to any costs, fees, and other expenses in connection with any proceeding to which section 7430 of the Internal Revenue Code of 1986 applies." 28 U.S.C. § 2412(e); *see also Info. Res., Inc. v. United*

*States*, 996 F.2d 780, 785 n.5 (5th Cir. 1993) ("The applicability of § 7430 precludes recovery of attorney's fees under the Equal Access to Justice Act." (citing *Smith v. Brady*, 972 F.2d 1095, 1099 (9th Cir.1992)); *United States v. McPherson*, 840 F.2d 244, 246 (4th Cir. 1988).

By its terms, Section 7430 applies to "any administrative or court proceeding which is brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title." 26 U.S.C. § 7430(a). As the U.S. Court of Appeals for the Fourth Circuit has explained,

> [t]his section prescribes in detail how and under what circumstances fees may be allowed in litigation over federal taxes. This precision would be pointless if fees could also be awarded in such cases under [other] standards.
>
> For this reason, section 7430 must be considered ... the exclusive authority for an award of attorney's fees in the class of cases described by § 7430.

*McPherson*, 840 F.2d at 246.

And the "class of cases" described by Section 7430 is expansive. "Several courts have interpreted the 'in connection with' language of § 7430 broadly," *Smith*, 972 F.2d at 1099, reasoning that, "[w]hile it may be true that not every case where the IRS is a party should automatically be considered a case arising 'in connection with' the determination of a tax, a broad reading of § 7430 in this case better effectuates Congressional intent in enacting this provision," *id.* at 1100; *see also id.* (reviewing cases that demonstrate "that a broad range of activity by the IRS arises in connection with the determination of tax liability").

Plaintiff does not dispute that the proceedings for which he seeks to recover attorneys' fees, costs, and expenses – "his bankruptcy case and the contested matter objecting to the IRS's penalty claim," Dkt. No. 14 at 46 – are proceedings "in connection with" the determination of a tax penalty. And Plaintiff does not argue that Section 7430 should not apply here.

Section 7430 accordingly precludes Plaintiff's claim for attorneys' fees under the EAJA.

III.    <u>Exhaustion, Res Judicata, and Limitations Bars to a 26 U.S.C. § 7430 Claim</u>

Finally, as to Plaintiff's claim for attorneys' fees, costs, and expenses under Section 7430 of the IRC, Defendants contend that, under Section 7430, only a prevailing party who has first exhausted his or her administrative remedies may recover attorney fees and that, absent a showing that these administrative remedies were first exhausted, the Court lacks jurisdiction over a Section 7430 claim. Defendants also argue that, notwithstanding Canada's failure to comply with the jurisdictional prerequisites for his Section 7430 claim, any such claim is barred by both res judicata and limitations.

But, in their reply and through counsel at oral argument, Defendants made clear that they are now primarily pressing limitations as the ground for dismissal. And, because the undersigned agrees that Plaintiff's Section 7430 claim was filed too late, the Court need not address Defendants' alternative arguments to they extent that Defendants still raise them.

Section 7430 of the IRC provides that,

> [i]n any administrative or court proceeding which is brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title, the prevailing party may be awarded a judgment or a settlement for –
> (1) reasonable administrative costs incurred in connection with such administrative proceeding within the Internal Revenue Service, and
> (2) reasonable litigation costs incurred in connection with such court proceeding.

26 U.S.C. § 7430(a). The statute defines "reasonable administrative costs" and "reasonable litigation costs" to include "reasonable fees paid or incurred for the services of attorneys in connection with the court proceeding." *Id.* § 7430(c)(1)(B)(iii) & (2)(B).

To qualify as a "prevailing party" and recover costs under Section 7430, a party must "meet[] the requirements of the 1st sentence" of 28 U.S.C. 2412(d)(1)(B) "except to the extent differing procedures are established by rule of court." 26 U.S.C. § 7430(c)(4)(A)(ii). The first sentence of 28 U.S.C. 2412(d)(1)(B) provides:

> A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed.

28 U.S.C. § 2412(d)(1)(B).

Defendants argue that because Plaintiff failed to file an application for fees within 30 days of the final judgment in his bankruptcy case, "his attorney fees claim is both untimely and barred." Dkt. No. 18 at 15 of 17.

But Plaintiff contends that "the 30-day limitations period of the Internal Revenue Code that Defendants rely upon ... was automatically extended by [Section

108(a)(2) of] the Bankruptcy Code to September 15, 2017, and this action is timely and not barred by limitations." Dkt. No. 20 at 28 of 31.

> Section 108(a) of the Bankruptcy Code provides:
>
> (a) If the applicable nonbankruptcy law ... fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of –
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> (2) two years after the order for relief.

11 U.S.C. § 108(a). And "Section 1107(a) of the Bankruptcy Code allows the rights and powers bestowed upon a trustee in § 108 to be exercised by a debtor-in-possession." *Cunningham v. Healthco, Inc.*, 824 F.2d 1448, 1459 (5th Cir. 1987) (footnote omitted); *see also* 11 U.S.C. § 1107(a).

Courts have held that "Section 108(a) tolls only those claims which have arisen prior to the filing of the petition, and *not* those which accrued after the filing of the petition." *Hanna Coal Co., Inc. v. I.R.S.*, No. Civ. A. 92-0071-B, 1994 WL 666928, at *2 (W.D. Va. Oct. 12, 1994) (citing *In re Tyler*, 166 B.R. 21, 26 (Bankr. W.D.N.Y.1994); *In re United Trucking, Inc.*, 91 B.R. 30, 31 (E. D. Mich.1988); *In re Northern Specialty Sales, Inc.*, 57 B.R. 557, 559 (Bankr. D. Or.1986)); *see also Matter of Phillip*, 948 F.2d 985, 987 (5th Cir. 1991); *In re Cent. Foundry Co.*, 62 B.R. 52, 56 (Bankr. N.D. Ala. 1985) ("Section 108(a) of the Bankruptcy Code deals only with causes of action which the debtor may have commenced which became property of the estate for the trustee to prosecute by virtue of the debtor's filing a petition under title 11. The Trustee's

cause of action in the instant suit, clearly arose post-petition; and it could not have been commenced by [the bankruptcy debtor] prior to its filing its Chapter 11 petition.").

In *Matter of Phillip*, the Fifth Circuit held that Section 108(a) did not apply to the plaintiff's contractual right to pursue an insurance claim within one year after the date of loss where the date of loss occurred after the plaintiff filed for bankruptcy. *Matter of Phillip*, 948 F.2d at 987. The court explained that,

> [a]ccording to its express terms, § 108 lengthens [the period in which a debtor may commence an action] only if "such period has not expired before the date of the filing of the [bankruptcy] petition." We construe the language of § 108 to extend the prescription period for prepetition claims to two years after entry of the order for relief, if prescription otherwise would run before that date. *Accord Northern Specialty Sales, Inc. v. INTV Corp. (In re Northern Specialty Sales, Inc.)*, 57 B.R. 557, 559 (Bankr. D. Or.1986).
>
> This construction emerges not only from the language, but also from the policy reasons underlying the statute. *See* H. Rep. No. 595, 95th Cong., 1st Sess. 318, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6275 (noting that the section operates to "permit the trustee, when he steps into the shoes of the debtor, an extension of time for filing an action or doing some other act that is required to preserve the debtor's rights"); S. Rep. No. 989, 95th Cong., 2d Sess. 30 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5816 (same). At least in the ordinary case, no compelling reason exists for extending the prescription periods of postpetition claims, since trustees or debtors in possession4 should be aware of them as they arise. *See In re Northern Specialty Sales*, 57 B.R. at 559.

*Matter of Phillip*, 948 F.2d 985, 987 (5th Cir. 1991).

Plaintiff's Section 7430 claim, although listed on his petition for bankruptcy relief, accrued postpetition. As explained above, to recover attorneys' fees under Section 7430, one must be a "prevailing party" – and, to be a "prevailing party," one must "substantially prevail[]" in the relevant administrative or court proceeding for which

costs and fees are sought. 26 U.S.C. § 7430(c)(4)(A)(i). Only when a prevailing party may be identified – when "final judgment" is entered – does the 30-day time period to claim attorneys fees under Section 7430 begin to run. *See* 28 U.S.C. § 2412(d)(1)(B). In cases where, as here, a party brings a Section 7430 claim for attorneys' fees incurred during a bankruptcy case, the claim's 30-day period will not run before the filing of the petition that initiated the bankruptcy case.

And, although Plaintiff listed his potential Section 7430 claim as an asset on his bankruptcy petition, Plaintiff could not have commenced his Section 7430 claim at any time prior to filing for bankruptcy. Indeed, Plaintiff's filing his petition and the IRS's subsequently filing a claim triggered the applicability of Section 7430 by creating the "court proceeding brought by or against the United States in connection with the determination, collection, or refund of any tax interest, or penalty." 26 U.S.C. § 7430 (a). And Plaintiff did not "prevail" against the IRS until, at the very earliest, the bankruptcy court entered a final order disallowing the IRS's tax penalty claim – nearly a year after Plaintiff filed his petition for relief.

No compelling reason otherwise exists for extending the 30-day period for Plaintiff's Section 7430 claim. *See Matter of Phillip*, 948 F.2d at 987. Plaintiff cannot dispute that he was aware of his claim when it arose, and Plaintiff otherwise gives no compelling reason for applying Section 108(a) to the specific facts at bar.

But there are persuasive reasons for declining Section 108(a)'s application here, where Plaintiff seeks to capitalize on the federal government's limited waiver of immunity. In considering the 30-day time limit imposed by the EAJA, 28 U.S.C.

2412(d)(1)(B) – which, as discussed above, applies to Section 7430 through 26 U.S.C.

§ 7430(c)(4)(A)(ii) – the Fifth Circuit has explained that,

> [b]ecause the EAJA represents a waiver of the federal government's immunity from suits for attorney's fees and because a waiver of sovereign immunity must be construed strictly, we hold that the statutory time limitation, as an integral condition of the sovereign's consent to be sued, is a jurisdictional prerequisite to an award of fees under the EAJA.
>> The District of Columbia Circuit has summarized Congress' intent regarding § 2412(d)(1)(B)'s thirty-day time limitation:
>>> The statutory language and legislative history of the Act, although not couched in the language of jurisdiction, indicate that Congress intended the filing deadlines to be enforced strictly. The statute uses the mandatory "shall." The House Conference Report accompanying the Act stated that the bill "requires a party seeking an award of fees and other expenses to submit the application for them within thirty days of final judgment." The House Report noted that under the bill, "a party seeking an award of fees must apply to the court within 30 days of final judgment."
>> *Action on Smoking & Health*, 724 F.2d at 225 (citing H.R. Conf. Rep. No. 1434, 96th Cong., 2d Sess. 26, reprinted in 1980 U.S. Code Cong. & Ad. News 5003, 5015; H.R. Rep. No. 1418, 96th Cong., 2d Sess. 18, reprinted in 1980 U.S. Code Cong. & Ad. News 4984, 4997) (emphasis supplied by Judge Bazelon).

*Clifton v. Heckler*, 755 F.2d 1138, 1144-45 (5th Cir. 1985). Guided by the Fifth Circuit's

analysis and the general rule that waivers of sovereign immunity must be narrowly

construed, *see Price v. United States*, 69 F.3d 46, 49 (5th Cir.1995), the undersigned is

persuaded that, at least in a case like this, Congress intended the specificity contained

in Section 2412(d)(1)(B) and Section 7430 to prevail over the more general provisions

of Section 108(a).

The undersigned concludes that Section 108(a) does not apply to Plaintiff's

Section 7430 claim and that Plaintiff's claim is therefore untimely.

## Recommendation

For the reasons and to the extent explained above, the Court should grant Defendants' Second Motion to Dismiss Plaintiff's Complaint [Dkt. No. 18] and dismiss Plaintiff William R. Canada, Jr.'s claims in his Amended and Restated Complaint [Dkt. No. 15] with prejudice.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: June 21, 2018

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE